J-S15045-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.G., NATURAL MOTHER | : | No. 67 WDA 2019 |

Appeal from the Order Entered September 18, 2018
In the Court of Common Pleas of Indiana County
Orphans' Court at No(s):  32-18-00126

| | | |
|---|---|---|
| IN THE INTEREST OF: M.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.G., NATURAL MOTHER | : | No. 68 WDA 2019 |
| | : | |

Appeal from the Order Entered September 18, 2018
In the Court of Common Pleas of Indiana County
Orphans' Court at No(s):  32-18-00127

BEFORE:    GANTMAN, P.J.E., SHOGAN, J., and COLINS*, J.

MEMORANDUM BY GANTMAN, P.J.E.:                    **FILED MAY 14, 2019**

Appellant, A.G. ("Mother"), appeals *nunc pro tunc* from the orders entered in the Indiana County Court of Common Pleas, which granted the petitions for involuntary termination of her parental rights to A.L. (born in March 2014) and M.G. (born in December 2015) ("Children").  We affirm.

The Orphans' Court opinions[1] accurately set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Mother raises two issues for our review:

> DID THE [ORPHANS'] COURT ERR WHEN IT RULED THAT
> GROUNDS FOR INVOLUNTARY TERMINATION OF MOTHER'S
> PARENTAL RIGHTS UNDER 23 PA.C.S.A. § 2511(A)(1), (2),

---

[1] The Orphans' Court issued a separate opinion for each child.

---

*   Retired Senior Judge assigned to the Superior Court.

(5), AND (8) HAD BEEN PROVEN BY CLEAR AND CONVINCING EVIDENCE?

DID THE [ORPHANS'] COURT ERR IN FINDING THAT TERMINATION WOULD BEST SERVE THE NEEDS AND WELFARE OF THE CHILDREN PURSUANT TO 23 PA.C.S.A. § 2511(B)?

(Mother's Brief at 19).[2]

The standard and scope of review applicable in termination of parental rights cases are as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.

_____

[2] Mother properly filed separate notices of appeal from the orders terminating her parental rights to each child. *See Commonwealth v. Walker*, ____ Pa. ____, 185 A.3d 969 (2018) (requiring separate notices of appeal from single orders which resolve issues arising on separate trial court docket numbers).

> We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008) (internal citations omitted).

The court granted the petition for involuntary termination of Mother's parental rights on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the

- 3 -

conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Thomas M. Bianco, we conclude Mother's issues merit no relief. The Orphans' Court opinions comprehensively discuss and properly dispose of the questions presented. (**See** Orphans' Court Opinions, filed December 12, 2018, at 4-10) (finding: mental health expert opined that Mother suffers from serious

- 4 -

delusions and diagnoses; given Mother's history of impairment and her poor response to treatment, Mother is unable to parent Children despite ongoing treatment; although Mother has complied with services, she has made no progress due to her mental health issues; Mother's persistent and profound mental health issues have interfered with her ability to perform parental duties; Mother's mental health issues have persisted throughout lifetime of minor Children, and Mother will unlikely be able to parent effectively despite ongoing treatment; Children's primary caregiver-child relationship is with foster parents and risk involved in severing those ties will be detrimental to Children; termination will best meet needs and welfare of Children; termination of Mother's parental rights was proper under Section 2511(a)(1), (2), (5), (8), and (b)).[3] Accordingly, we affirm on the basis of the Orphans' Court opinions.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/14/2019

---

[3] The court appointed separate legal-interests counsel for Children. Counsel stated he was unable to identify any conflict between Children's legal interests and the recommendation of the guardian *ad litem* that termination of Mother's parental rights served Children's best interests.

**IN THE INTEREST OF:**          :IN THE COURT OF COMMON PLEAS OF
                                 :INDIANA COUNTY, PENNSYLVANIA
M·G·                             :
                                 :CIVIL ACTION – Juvenile Division
                                 :No. 19   DP   2017
                                 :
                                 :Orphans' Court Division

## OPINION PURSUANT TO Pa.R.A.P. Rule 1925(a)

This Court entered a Decree of Termination on September 18, 2018.

By Order of Court dated November 9, 2018, this Court granted A·G·'s

request to file an appeal *nunc pro tunc*, and a Notice of Appeal was filed with

the Clerk of the Orphans' Court Division on November 21, 2018. The Court

submits this Opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of

Appellate Procedure to supplement the Decree of Termination.

## PROCEDURAL HISTORY AND FACTS

M·G· is a minor child. His date of birth is in December, 2015.

He was two years of age at the time of the termination hearing; he is now

three years of age. The minor child's biological mother is A·G·

(hereinafter "Natural Mother). On March 8, 2017, a Shelter Care Hearing

was held before the Honorable William J. Martin, and the Shelter Care

Application was granted. On March 16, 2017, this Court found that the

minor child was a dependent child and ordered that he remain in his foster

1



care placement with his sibling, A . L ; the siblings were placed in the licensed foster home on March 13, 2017. The Court held Permanency Review Hearings on July 6, 2017, October 12, 2017, February 15, 2018, and August 2, 2018. The siblings have remained in the same foster care placement from their initial placement to the present.

Indiana County Children and Youth Services (hereinafter the "Agency") filed a Petition for Termination of Parental Rights. Through the Petition, the Agency sought to terminate the parental rights of Natural Mother and J. L. (hereinafter "Natural Father"). The Court notes that Natural Father voluntarily relinquished his parental rights prior to the conclusion of the termination hearing. The Agency alleged that the following subsections of 23 Pa.C.S.A. §2511(a) established the basis for terminating parental rights of Natural Mother:

> (1) The parent by conduct continuing for a period of at least six (6) months immediately preceding the filing of the Petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> (5) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an Agency for a period of at least six (6) months, the conditions which led to the removal or

2

placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

A hearing on the Agency's Petition was held on August 28, 2018. The Court heard expert testimony from Carol Hughes, a licensed psychologist, and Dr. Carolyn Menta, a clinical psychologist. Ms. Hughes authored a Bonding Assessment and Dr. Menta authored a Parental Capacity Evaluation. Both reports were marked and admitted into evidence. (Agency Exhibit 1 and Agency Exhibit 2, respectively). The Court also heard testimony from Rachel Pommer, the Agency caseworker assigned to this matter, Natural Mother, Natural Father (by telephone), and Vickie McCall, the mother of Natural Mother.

At the hearing, the Agency was represented by William Carmella, Esquire, Natural Mother was represented by Gina Force, Esquire, Natural Father was represented by Katrina Kayden, Esquire, Joelyssa Ferringer (now

3

Joelyssa Johnson), Esquire, served as Guardian ad Litem for the children, and Thomas A. Kauffman, Esquire, served as legal counsel for the children.

## DISCUSSION

The Court will focus on the testimony and report of Dr. Carolyn Menta, because Natural Mother's persistent and profound mental health issues are at the core of the Court's decision in this matter. Natural Mother has been hospitalized for her mental health conditions on at least 13 occasions. This includes an inpatient hospitalization at Torrance State Hospital from June 2009 through January 2011. Her most recent hospitalization was at Clarion Psychiatric Hospital in May of 2017; she subsequently was transferred to Torrance State Hospital, and was released in July 2017. Parental Capacity Evaluation, Agency Exhibit 2, pgs. 1-2.

Dr. Menta's reports that "[f]or the past couple of years Natural mother has been calling crisis quite frequently. She has been reporting that someone is sneaking into her house and cutting her hair, shooting guns at her, and leaving dead animals on her porch." Id at p. 2. Natural Mother is unsure of the identity of M. G. 's father. Id. And when discussing the identity of A. L.'s father, Natural Mother reported that she is unsure who the father is, stating "the men keep switching faces. I think they were in on it together." Id. When Dr. Menta asked Natural Mother to clarify this statement, she

4

went on to say "that she believed a man impregnated her and was sneaking in another man who looked similar, posing as A.L.'s father." Id.

Dr. Menta also performed a mental status examination and conducted diagnostic testing on Natural Mother. Based upon a review of Natural Mother's mental health records, the mental status examination, and the diagnostic testing, Dr. Menta rendered a current diagnosis as Schizophrenia and Borderline Personality Disorder.

Dr. Menta then concluded her report by providing a summary and recommendations. She stated as follows:

"I have serious concerns about Natural mother's ability to parent her children. Without grounding in reality, much of her behavior is driven by her psychosis. She responds to internal stimuli, such as auditory and visual hallucinations. She maintains paranoid delusions and believes the family of A.L.'s father is harassing and stalking her, shooting guns at her, writing on her home, and leaving dead animals on her porch. She further believes someone is coming into her home and cutting her hair. When she is not grounded in reality, Natural mother will not be able to establish a stable, calm home environment for her children. Indeed, children of parents with psychosis tend to develop symptoms themselves over time. Some of this can be attributed to genetics, and as well as other correlates of mental health, such as

5

parental discord, paranoia, and aggressive behavior or neglect. Children of parents with schizophrenia tend to develop more anxious attachment patterns and are at greater risk for developing attachment disorder, such as Reactive Attachment Disorder." Id at pgs. 4-5.

Dr. Menta then concluded that "given [Natural Mother's] severe history of impairment and relatively poor response to treatment, it is highly unlikely she will be able to parent effectively despite ongoing treatment." Id at p. 5).

An Agency caseworker Rachel Pommer testified concerning her involvement with Natural Mother and the minor child. Ms. Pommer stated that the Agency conducted a general protective services investigation in February of 2015, and opened a general protective services case in April of 2015. These efforts were with regard to M·G·'S sibling, A·L·, who was less than one year old at the time of the initial investigation.

The Agency then received a call on March 8, 2017, regarding the fact that M·G· was taken to the hospital with a head injury. As stated above, the Agency's Shelter Care Application was granted by the Honorable William J. Martin on March 8, 2017, and this Court found the child to be a dependent child following an adjudication hearing on March 16, 2017. The Court notes that Natural Mother did sign a Voluntary Placement Agreement on March 8, 2017. M·G· and his sister were placed together in a licensed foster home

6

on March 13, 2017, and have remained in that home until the present time. Ms. Pommer testified that the children are very comfortable and happy in the foster home.

With regard to Natural Mother's progress, Ms. Pommer testified that overall, Natural Mother has complied with services, but she has not made progress. Ms. Pommer testified that the Agency has made consistent efforts to reunify M.G. and his sister with Natural Mother, including facilitating visitations, providing parenting services, and recommending and monitoring mental health treatment. These efforts have been discussed at length during the four permanency review hearings held before this Court. Ultimately, Ms. Pommer testified that she believes Natural Mother's mental health issues have prevented progress toward reunification, stating that at her mental health baseline, Natural Mother is delusional and paranoid, and despite this fact, she at times denies any mental health issues.

Natural Mother also provided testimony to the Court in this matter. She did not dispute the nature and extent of her prior mental health issues or commitments. However, she did state that since leaving Torrance State Hospital in July of 2017, her mental health has been level, she is taking her medications, and she is doing well. She stated that she has not had delusions since July of 2017. She acknowledged that she is currently under

7

a Court ordered mental health commitment, but she has no concerns about her ability to care for her children.

Based upon the testimony provided to the Court, the Court finds that statutory grounds for termination under 23 Pa.C.S.A. Section 2511(a)(1), 23 Pa.C.S.A. Section 2511(a)(2), 23 Pa.C.S.A. Section 2511(a)(5), and 23 Pa.C.S.A. Section 2511(a)(8) have been proven by clear and convincing evidence. As stated above, the Court believes that Natural Mother's persistent and profound mental health have resulted in her failure to perform parental duties for M.G. These mental health issues have persisted during the entire lifetime of the minor child, and with regard to whether these conditions can be remedied, the Court finds the conclusion of Dr. Menta to be credible and accurate; Dr. Menta concluded that "given [Natural Mother's] severe history of impairment and relatively poor response to treatment, it is highly unlikely she will be able to parent effectively despite ongoing treatment."

Finally, the Court acknowledges that a termination of parental rights is a two-step process; first, the Court must look to the conduct of the parent to determine whether at least one of the statutory grounds for termination has been satisfied by clear and convincing evidence, and second, the Court must determine whether a termination of parental rights best serves the needs and welfare of the child. In re S.D.T., Jr., 934 A.2d 703 (Pa.Super.

8

2007). As set forth above, the Court finds that several statutory grounds for termination have been satisfied, therefore, the Court will turn to step two, i.e., the considerations pursuant to 23 Pa.C.S.A. Section 2511(b).

The Agency presented testimony from Carol Hughes, a licensed psychologist, regarding the parent-child bond. Ms. Hughes conducted a parent-child bond evaluation in this matter, and Ms. Hughes' written Bonding Assessment was admitted as Agency Exhibit 1. The Court finds Ms. Hughes' evaluation to be thorough; she conducted a records review, an observation of the children with Natural Mother, and an observation of the children in the foster home.

Ms. Hughes concludes that "[w]ith respect to M.G., the relational pattern with Natural Mother presents as one of familiarity." Bonding Assessment, Agency Exhibit 1, p. 11. Ms. Hughes then states that the "primary caregiver-child relationship provided to the children by the foster parents has been of a quality, sensitivity, and affective attunement, and the children, at this time, do not appear to be presenting with symptoms of trauma-attachment disorder." Id. Ms. Hughes then expresses concern over a possible break in the current secure child-caregiver relationship (with the foster parents), and expresses concern over Natural Mother's capacity "to meet A.L.'s and M.G.'s current needs and foster healthy attachment

9

experiences, as well as have the capacity to respond to and remedy the disruption to the normal development of secure attachment resulting from trauma." Id at 12. Based on the credible testimony of Carol Hughes, the Court finds that the needs and welfare of the child will be met through granting the petition.

BY THE COURT:

Thomas M. Bianco, J.

10

IN THE INTEREST OF:

A. L.

:IN THE COURT OF COMMON PLEAS OF
:INDIANA COUNTY, PENNSYLVANIA
:
:CIVIL ACTION – Juvenile Division
:No. 18   DP   2017
:
:Orphans' Court Division

## OPINION PURSUANT TO Pa.R.A.P. Rule 1925(a)

This Court entered a Decree of Termination on September 18, 2018. By Order of Court dated November 9, 2018, this Court granted A ·G· 'S request to file an appeal *nunc pro tunc*, and a Notice of Appeal was filed with the Clerk of the Orphans' Court Division on November 21, 2018. The Court submits this Opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure to supplement the Decree of Termination.

## PROCEDURAL HISTORY AND FACTS

A ·L. is a minor child. Her date of birth is in March, 2014; she is four years of age. The minor child's biological mother is A ·G· (hereinafter "Natural Mother). On March 8, 2017, a Shelter Care Hearing was held before the Honorable William J. Martin, and the Shelter Care Application was granted. On March 16, 2017, this Court found that the minor child was a dependent child and ordered that she remain in her foster care placement with her sibling, M ·G· ; the siblings were placed in

1



the licensed foster home on March 13, 2017. The Court held Permanency Review Hearings on July 6, 2017, October 12, 2017, February 15, 2018, and August 2, 2018. The siblings have remained in the same foster care placement from their initial placement to the present.

Indiana County Children and Youth Services (hereinafter the "Agency") filed a Petition for Termination of Parental Rights. Through the Petition, the Agency sought to terminate the parental rights of Natural Mother and J.L. (hereinafter "Natural Father"). The Court notes that Natural Father voluntarily relinquished his parental rights prior to the conclusion of the termination hearing. The Agency alleged that the following subsections of 23 Pa.C.S.A. §2511(a) established the basis for terminating parental rights of Natural Mother:

> (1) The parent by conduct continuing for a period of at least six (6) months immediately preceding the filing of the Petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> (5) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an Agency for a period of at least six (6) months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the

2

services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

A hearing on the Agency's Petition was held on August 28, 2018. The Court heard expert testimony from Carol Hughes, a licensed psychologist, and Dr. Carolyn Menta, a clinical psychologist. Ms. Hughes authored a Bonding Assessment and Dr. Menta authored a Parental Capacity Evaluation. Both reports were marked and admitted into evidence. (Agency Exhibit 1 and Agency Exhibit 2, respectively). The Court also heard testimony from Rachel Pommer, the Agency caseworker assigned to this matter, Natural Mother, Natural Father (by telephone), and Vickie McCall, the mother of Natural Mother.

At the hearing, the Agency was represented by William Carmella, Esquire, Natural Mother was represented by Gina Force, Esquire, Natural Father was represented by Katrina Kayden, Esquire, Joelyssa Ferringer (now Joelyssa Johnson), Esquire, served as Guardian ad Litem for the children, and Thomas A. Kauffman, Esquire, served as legal counsel for the children.

3

## DISCUSSION

The Court will focus on the testimony and report of Dr. Carolyn Menta, because Natural Mother's persistent and profound mental health issues are at the core of the Court's decision in this matter. Natural Mother has been hospitalized for her mental health conditions on at least 13 occasions. This includes an inpatient hospitalization at Torrance State Hospital from June 2009 through January 2011. Her most recent hospitalization was at Clarion Psychiatric Hospital in May of 2017; she subsequently was transferred to Torrance State Hospital, and was released in July 2017. Parental Capacity Evaluation, Agency Exhibit 2, pgs. 1-2.

Dr. Menta's reports that "[f]or the past couple of years Natural Mother has been calling crisis quite frequently. She has been reporting that someone is sneaking into her house and cutting her hair, shooting guns at her, and leaving dead animals on her porch." Id at p. 2. When discussing the identity of A.L.'s father, Natural Mother reported that she is unsure who the father is, stating "the men keep switching faces. I think they were in on it together." Id. When Dr. Menta asked Natural Mother to clarify this statement, she went on to say "that she believed a man impregnated her and was sneaking in another man who looked similar, posing as A.L.'s father." Id. She also is unsure of the father of A.L.'s sibling, M.G. Id.

4

Dr. Menta also performed a mental status examination and conducted diagnostic testing on Natural Mother. Based upon a review of Natural Mother's mental health records, the mental status examination, and the diagnostic testing, Dr. Menta rendered a current diagnosis as Schizophrenia and Borderline Personality Disorder.

Dr. Menta then concluded her report by providing a summary and recommendations. She stated as follows:

"I have serious concerns about Natural mother's ability to parent her children. Without grounding in reality, much of her behavior is driven by her psychosis. She responds to internal stimuli, such as auditory and visual hallucinations. She maintains paranoid delusions and believes the family of A.L.'s father is harassing and stalking her, shooting guns at her, writing on her home, and leaving dead animals on her porch. She further believes someone is coming into her home and cutting her hair. When she is not grounded in reality, Natural mother will not be able to establish a stable, calm home environment for her children. Indeed, children of parents with psychosis tend to develop symptoms themselves over time. Some of this can be attributed to genetics, and as well as other correlates of mental health, such as parental discord, paranoia, and aggressive behavior or neglect. Children of parents with schizophrenia tend to develop more anxious

5

attachment patterns and are at greater risk for developing attachment disorder, such as Reactive Attachment Disorder." Id at pgs. 4-5.

Dr. Menta then concluded that "given [Natural Mother's] severe history of impairment and relatively poor response to treatment, it is highly unlikely she will be able to parent effectively despite ongoing treatment." Id at p. 5).

An Agency caseworker Rachel Pommer testified concerning her involvement with Natural Mother and the minor child. Ms. Pommer stated that the Agency conducted a general protective services investigation in February of 2015, and opened a general protective services case in April of 2015. A.L. was less than one year old at the time of the initial investigation.

The Agency then received a call on March 8, 2017, regarding the fact that A.L.'s brother, M.G., was taken to the hospital with a head injury. As stated above, the Agency's Shelter Care Application was granted by the Honorable William J. Martin on March 8, 2017, and this Court found the child to be a dependent child following an adjudication hearing on March 16, 2017. The Court notes that Natural Mother did sign a Voluntary Placement Agreement on March 8, 2017. A.L. and her brother were placed together in a licensed foster home on March 13, 2017, and have remained in that

6

home until the present time. Ms. Pommer testified that the children are very comfortable and happy in the foster home.

With regard to Natural Mother's progress, Ms. Pommer testified that overall, Natural Mother has complied with services, but she has not made progress. Ms. Pommer testified that the Agency has made consistent efforts to reunify A.L. and her brother with Natural Mother, including facilitating visitations, providing parenting services, and recommending and monitoring mental health treatment. These efforts have been discussed at length during the four permanency review hearings held before this Court. Ultimately, Ms. Pommer testified that she believes Natural Mother's mental health issues have prevented progress toward reunification, stating that at her mental health baseline, Natural Mother is delusional and paranoid, and despite this fact, she at times denies any mental health issues.

Natural Mother also provided testimony to the Court in this matter. She did not dispute the nature and extent of her prior mental health issues or commitments. However, she did state that since leaving Torrance State Hospital in July of 2017, her mental health has been level, she is taking her medications, and she is doing well. She stated that she has not had delusions since July of 2017. She acknowledged that she is currently under a Court ordered mental health commitment, but she has no concerns about her ability to care for her children.

7

Based upon the testimony provided to the Court, the Court finds that statutory grounds for termination under 23 Pa.C.S.A. Section 2511(a)(1), 23 Pa.C.S.A. Section 2511(a)(2), 23 Pa.C.S.A. Section 2511(a)(5), and 23 Pa.C.S.A. Section 2511(a)(8) have been proven by clear and convincing evidence. As stated above, the Court believes that Natural Mother's persistent and profound mental health have resulted in her failure to perform parental duties for N.L. These mental health issues have persisted during the entire lifetime of the minor child, and with regard to whether these conditions can be remedied, the Court finds the conclusion of Dr. Menta to be credible and accurate; Dr. Menta concluded that "given [Natural Mother's] severe history of impairment and relatively poor response to treatment, it is highly unlikely she will be able to parent effectively despite ongoing treatment."

Finally, the Court acknowledges that a termination of parental rights is a two-step process; first, the Court must look to the conduct of the parent to determine whether at least one of the statutory grounds for termination has been satisfied by clear and convincing evidence, and second, the Court must determine whether a termination of parental rights best serves the needs and welfare of the child. In re S.D.T., Jr., 934 A.2d 703 (Pa.Super. 2007). As set forth above, the Court finds that several statutory grounds for

8

termination have been satisfied, therefore, the Court will turn to step two, i.e., the considerations pursuant to 23 Pa.C.S.A. Section 2511(b).

The Agency presented testimony from Carol Hughes, a licensed psychologist, regarding the parent-child bond. Ms. Hughes conducted a parent-child bond evaluation in this matter, and Ms. Hughes' written Bonding Assessment was admitted as Agency Exhibit 1. The Court finds Ms. Hughes' evaluation to be thorough; she conducted a records review, an observation of the children with Natural Mother, and an observation of the children in the foster home.

Ms. Hughes concludes that "[w]ith respect to A.L. the relational pattern with Natural Mother presents as insecure." Bonding Assessment, Agency Exhibit 1, p. 11. Ms. Hughes then states that the "primary caregiver-child relationship provided to the children by the foster parents has been of a quality, sensitivity, and affective attunement, and the children, at this time, do not appear to be presenting with symptoms of trauma-attachment disorder." Id. Ms. Hughes then expresses concern over a possible break in the current secure child-caregiver relationship (with the foster parents), and expresses concern over Natural Mother's capacity "to meet A.L.'s and M.G.'s current needs and foster healthy attachment experiences, as well as have the capacity to respond to and remedy the disruption to the normal

9

development of secure attachment resulting from trauma." Id at 12. Based on the credible testimony of Carol Hughes, the Court finds that the needs and welfare of the child will be met through granting the petition.

BY THE COURT:

Thomas M. Bianco, J.

I hereby CERTIFY that this document is recorded in the Clerk of the Orphans' Court Office of Indiana County, Pennsylvania



Patricia Streams-Warman
Clerk of the Orphans' Court

10